The next piece on the docket is Highland Supply Corporation v. Illinois Power Company, cause number 5-11-0014. And Mr. Lucco, whenever you're ready, you may proceed, sir. Thank you, sir. May it please the court. I'm Bill Lucco. I'm here with my partner Chris Strokel, representing the Highland Supply Corporation and the appellant in the case. Really, this case is about the interpretation of the phrase, or even a sentence, in two electric service contracts. These were contracts that had their genesis in 1995. The contracts that issued were executed in 1997. They were born of this new spirit of competition in the utility field, and they had in them a phrase that gave great flexibility to Highland Supply Corporation when those contracts terminated. These contracts between Highland Supply Corporation and Illinois Power moved Highland Supply Corporation from years of taking its electric service from the city of Highland, a municipal electric utility, to taking its electric service from Illinois Power. Now, today, Illinois Power or Ameren would have us be denied or stop entirely that competition and take us back in time and back in philosophy, which would not only deprive Highland Supply Corporation of the built-in flexibility that the thereafter clause has, spelling out the rights of the parties at the termination of the contract, but would really deprive us of even going back to where we were before. To get there, and to put that sort of interpretation on the thereafter clause, we contend that Illinois Power does some gymnastics that just don't make sense with the meaning of electric service. So, let me address that electric service issue initially before I get to the thereafter clause, if I may. Both these contracts in 1997, to service two facilities at Highland Supply Corporation, are entitled electric service contracts. They followed on the heels of a prior electric service contract entered into in 1995 between Illinois Power and Highland Supply Corporation. At the same time in 1995, electric service contracts were entered into, there was an indemnification agreement entered into. That indemnification agreement is important because it helps us understand the thinking and intent of the parties as to the meaning of certain words. And that indemnification agreement was attached again as an exhibit to the two 1997 electric service contracts. And I want to read to you what is in that electric service indemnification agreement. Because, again, it tells us about the history of changing from the City of Highland to Illinois Power. Customer, Highland Supply Corporation, this is paragraph number one. It's exhibit A, the first contract that's in the common law record at page 10. It's also exhibit B, the second contract. Customer and Illinois Power have entered into an electric service contract of even date herewith, pursuant to which customer will discontinue purchasing electric service from the City of Highland or an affiliated entity or corporation and will commence purchasing electric service from Illinois Power. Electric service was, you know, when the customer turns on the light switch, we get electric service. If we get power, we don't. If it doesn't get power, there could be many components in that light, so to speak, that is going wrong, but we don't care as the customer. We are contracting for electric service. We're not contracting, we're not going through the gymnastics that Illinois Power does about whether that electric service in one phrase meant supply only, whether it means delivery in another phrase. We could have called these electric supply contracts. We could have entered into one that said electric delivery contract. We had entered into it in 1995 and twice in 1997 with electric service contracts. And as part of those is the indemnification agreement that simply said what it said, stop taking your electric service from the city, begin taking electric service from us. Everything. So what happens after those contracts? We stop taking all of our electric service from the city and we start getting all of our electric service from Illinois Power. And was the purpose of the indemnification agreement because there was some concern or issue about whether this switch at that time would hold up in court? Yes, sir. And there's another side in the record that I want to direct you to that supports this and I believe clinches it even further. And it's found in the record. It's three pages. C-112, C-113, and C-114. And it's a letter. So I'm going to take that. So in 1995, we're explaining electric service. Entered into contracts in 1997 talking about electric service. The contracts are going to end in 2000. In January 27th of 1999, so sort of midway through this contract, Illinois Power writes the Illinois Commerce Commission. This was in January of 1999. And they say it's a two-page accompanying letter kind of laying out the history of this because they're explaining why they need to have another little point, delivery point. And I'm going to quote from this, but I direct your attention to these pages in the record. Highland Supply advised Illinois Power that competitive alternatives under consideration included self-generation or relocation of manufacturing of one or more of Highland Supply's facilities located in North Carolina, Oklahoma, and or Mexico. The rates in the contracts we negotiated were to provide Highland Supply an economic incentive to take electric service from Illinois Power. There's several points that are important in this letter. I'm going to make them all now, but I'll come back to them. This letter talks exclusively of electric service. There's no talk about electric supply. There's no talk about electric delivery. There's no talk about bundled services, unbundled services. It talks about, midway through this contract, giving us electric service. It talks about this being because of the competition necessary. It goes on to say that Illinois Power believes that Highland Supply would have continued either to take electric service from the city of Highland or move located facilities outside the state of Illinois if the agreement had not been reached. The company believes that it's imperative for the benefit of Illinois Power and its other customers to attract customers with municipal or relocation alternatives at a price level which more than recover the company's short-run marginal cost of service, including investments in facilities to render services. Illinois Power was able to negotiate an agreement with Highland Supply to increase revenues and recover the associated contribution to fixed costs. This not only drives home that electric service means electric service. It may have many components. Maybe at some points in time we call it component supply. Maybe we call it delivery. Maybe we call it something else. But these parties contracted in 1995, and then these contracts in 1997 for electric service. Furthermore, this letter drives home the point of the competition that existed and that they set rates and agreed to them that recouped their marginal costs of this project and even their investment in the facilities. I'm going to come to that when I get to their... Did the trial court in any way distinguish the language that's in the contract that says at the end of the third year following the effective date, this contract terminates and thereafter customer may take electric service from any source? Did the trial court in any way distinguish that, analyze that? The trial court... Say it didn't mean what it said? The trial court read into that. It's obvious the trial court struggled with this. You can tell that when you look at the order because... Here's a brief paragraph of the order. Paragraph 3 of Judge Harrison's order. The only power of company's cross motion for summary judgment is granted solely on the basis of the court's limited interpretation of the contract phrase thereafter customer may take electric service from any source. It goes on to say, as naturally and reasonably creating a single opportunity to choose that arose the next logical time for an election to occur, i.e., upon the expiration of the single three-year contract term. And conversely, that phrase did not create an ongoing or unlimited option to make other or additional choices after the agreements had terminated. He talks about elections. He talks about the end of this. He talks about a single opportunity. And that's why we're here today. Because we ask the court to construe the rights of the parties, Illinois Compound and Howard Supply Corporation, about this thereafter phrase so we know we're free, as to them, to go out in the marketplace as we may be allowed and seek competitive electric service. That's what we want to be able to do. We don't want Illinois Power to be able to interfere with that. We don't want Illinois Power to be able to say, no, no, you can't do that because you had a single opportunity to do that. And when you continued on with us or when you later changed the supply source, you've exercised that opportunity that's lost forever. We disagree with the court. We believe that thereafter phrase, Your Honors, is ongoing and unlimited. As to us and Illinois Power, I do. Because I think so much time was taken up in the briefs on the supply-demand point, I wanted to cut right to the chase and drive home what I believe is the clear intent of the parties. Stop taking it from the city, take it from us. That's everything. That's electric service. Commerce Commission, we're providing them electric service because there's competition. We can do this. It's good for them to be able to have a competitive price and go between us and somewhere as opposed to potentially relocating. We have a corporation with hundreds of employees in our county that competes truly globally. Their products compete with China on a daily basis. These contracts for service are significant. That's going to take me now to the thereafter phrase. I believe the plain meaning of the thereafter phrase is that it's a continuum. It can't be a point in time. It means from then on. It means forever after. If the parties had wanted to say there was a deadline, like when the judge, I believe, struggles and says, you know, the next logical and natural time was when the election could occur, we could have said within 30 days, exercise your singular option. Or within a year. Or we could have had a deadline. We could have made clear that this was not going to be ongoing. None of that was done by these sophisticated parties. Thereafter, you may choose your elected service from any source, or you may choose it from us under their terms. Now, we can anticipate at that time what could we negotiate with these other people. But as to AMRA, it talks about we'll take it under their tariffs that are in existence at that time. So I believe the plain meaning of thereafter not only is self-explanatory. It's not a point in time. But when you look at the expression that says we may choose or we may choose, it's so benign, it's so soft in its expression of our freedom to choose, if you will. It doesn't say we shall within so many days, or we must within so many days. It has this sense of freedom, which is the world in which we are now moving. As I quote from the Appley's brief, their page three where they talk about for the first time, they've introduced competition to the Illinois electricity market and moved the Illinois electric industry from a heavily regulated world toward a competitive marketplace. Let's now think about what are they complaining about. What they're really saying, they conceded in page eight of the brief, they said we don't care where you take supply, because we think you may choose elected service from any source means elected supply. I don't know how they did that. But we don't care if you do that. But you're stuck with us on delivery. Now you're back to the old days of a monopoly on delivery. And we see where they find that language in existing statute. But let's think about, one, that's not what we contracted with them for. Two, think about the policy underlying that. Why would we have a regulation that protects them? Well, good sense. Well, they got investments. They got costs. We want to make sure they make them. We want to make sure they charge rates that cover them so they don't have problems. But they told the Commerce Commission, back when they got permission to enter into these contracts with us, mind you, had to be competitive, that's why. And again in the 1999 letter, they told us there was competition. That was the point of this. They told us that they had negotiated rates that covered their marginal costs, that covered their investment in the facilities. And they negotiated a three-year term. We continued to take from them, and they're still delivering us services, eight years after that. So the competition aspect of this, the necessity part, is not applicable in our case. It's been met and satisfied, and they've admitted it. What would Highland Supplies Rights be today as the choice of electrical provider, had there never been these contracts? Well, we would have whatever the law allows. And we're willing to live with that in the great world, but in the world with Illinois Power Amarin. We don't want them to tell us what we can do and not do. We negotiated a contract with them that gave us the ultimate flexibility. You may choose from any source. You may choose from us under these terms. Here's the point I'm trying to figure out. Are you claiming more right to choose than you would have had had you never been in the contracts? No. You just want to be where you would be. That's correct. Thereafter means you get a choice. You get the same choice as everybody else does. Yes. And as to Illinois Power, they cannot block us. Maybe there will be other obstacles to certain competitive edges. They can't block you through these contracts. Yes, that's right. And the trial court decided in this case, in summary judgment, solely on an interpretation of the contract. It didn't have anything to do with the Illinois statute. It didn't, Your Honor. It didn't have consumer choice law or supplier or delivery or anything like that strictly on the interpretation. They did, and the court read into it and made clear you have a single opportunity, and your timing is the next natural time. I mean, one of the kind of silly arguments here fought off was, well, what did that mean since the parties didn't put a time on it, and you're saying there is one. Well, when the clock struck midnight? That's what they're contending. Midnight, December 31st, 2000. You had a nanosecond to do something? Well, that's, again, absurd. And I'm going to come back to the argument they made. What their fears are, they say. Let's think we change what Judge Harrison said, and we say, no, you don't have a single opportunity. You have an ongoing opportunity under this timeline. Well, that's going to let these businessmen act on a whim. Well, who thinks that anybody is acting on a whim on contracts of this nature? These contracts took a couple of years to be negotiated. These are not whimsical decisions that businessmen make, how they take electric service to large manufacturing facilities. That's a silly argument. It's almost insulting. Then they go on to say it would give us carte blanche to choose. Well, the contract does say we may choose electric service, and we now know how all-encompassing that is from any source. I say, what is the problem with carte blanche? What does that mean? We know there still remains regulation in these industries, but what's offensive about us having choice? What's offensive about Adam Supply having carte blanche to look at the buffet of options it has for electric service, whether it comes in component parts or comes in a total package? What's wrong with that? That's the fallback about the fear they have if you all change this interpretation and say, no, under this contract, Adam Supply had the right to an ongoing choice it could make of its electric service providers. It wasn't limited to a single opportunity. They're not now forever in the electric and the alloy power delivery service and can never get out. Was there anything that prevented Ameren, prior to the stroke of midnight, from negotiating an extension of these contracts for a specific term? No, Your Honor. Do you think they could have come along before it expired and said, we want to extend this, it ends? They could have. We could have negotiated more. There is also, I want to say, a provision in the contract that reads, and I want to excerpt it. We generally call them the non-waiver provision, but actually it's more than that because it says, nor shall any single exercise of any right preclude other or further exercise thereof. That the judge paid no attention to, that the contract actually said, you can't reconcile that clause with his construction that we have a single opportunity because it says in here, no single exercise of a right, the right in which we may choose from any source, can preclude a further exercise of that right. Thank you, Mr. Bucco. We'll leave some time on the rebuttal. Mr. Hemphill? Yes, Your Honor. I'd like to start off, Justice Stewart, if I may, with a very important point. It was in one of your recent questions. It had to do with your question about could Hemrin have renegotiated or extended it. The tariff, first of all, this contract only exists by the discretion and allowance of the Commerce Commission. Hemrin had to get their approval. There is a specific tariff that applies that allowed for this contract. That tariff says it has to have a sunset date of five years at the max, cannot be renewed. And that is in our brief at page five. It's also in the tariff and the record, CD-144. You could have negotiated for a different rate, though. We could not. And had it approved, you could not. Well, you continue to provide them with service at some standard rate pre-approved. We did. It was the default tariff by their choice. And there wasn't anything wrong, though, with that, right? I mean, so you could not negotiate at all and have anything approved by the Commerce Commission. Your Honor, let me give you a little context here. Public utilities, the quintessence of public utility regulation is you do not discriminate among your customers. You do not offer special rates or rebates. In the 19th century, railroads did this. It led to our contemporary system of public regulation. These contracts, IP was only allowed three of these in their entire service area. They were tightly controlled because it's a favorable rate. Highland Supply got rate discounts that no one else could get. And the reason they were able to negotiate for those was their leverage by threatening to either leave the state with their employees or to move back to a competitive provider. The only reason the commission would allow Illinois Power to have a contract with discounts was because of the threat, the economic importance of keeping jobs in the state. That's how Irma got the dispensation in the first place. Okay, now let me ask the same question I asked Mr. Lucco. In the absence of, let's say you never had this contract, or in the absence of the contract, what would be Highland Supply's right to switch providers otherwise? Your question? I mean, my point is, is your argument that they are not allowed to choose a new provider based solely on the contract? No, the contract became null and void. That's express terms in 2000. At that point, and Highland Supply had three years' notice that what was going to happen. And I'd like to just make sure you understand the clause here. Because they like to cite the thereafter clause, but they don't really read the whole clause. And really the point I'm trying to make is you talk a lot about consumer choice law and so forth. I mean, is there something in the statutes or regulations of the state of Illinois that, regardless of this contract, would prevent Highland Supply from switching providers? Absolutely, Your Honor, but it's a distinction. Prohibition has to do with the customer choice act. The General Assembly erected this barrier, not I am. The General Assembly said that on the effective date of the act, which is December 17, 1997, on that date, if you are an investor owned utility customer, a public utility customer, not a municipal customer or a co-op customer, the statute only applies to industrial utility, you have only the rights that are granted by the General Assembly. The deregulation law was earth-shaking. And what it did was it uncoupled generation power plants from the infrastructure and wires business. Thereafter, you could, the customer under tariff could take the bundle from the industrial utility, but they also obtained the right to uncouple from the power supply and purchase competitive power supply. They haven't actually done that. Highland Supply in 2009, during the pendency of this case, chose, exercised its rights as an electric utility customer to unbundle and purchase competitive power supply. That's their status right this minute. We have no problem with that. The General Assembly said we are not allowing that customer, that investor owned utility customer, to also uncouple from delivery service because of the vast investment in the infrastructure. We're going to take, we're going to force the utilities to compete on the power supply side of the equation. Customers can now shop for power. But we're going to preserve the monopoly. And that is preserved, and that's not our dictate. That's what the General Assembly wanted. That was lynched deregulation. So let's suppose we said, you know, we disagree with the trial court and the interpretation of the contract that we say thereafter means any time thereafter. And at any time thereafter, Highland Supply has whatever rights it has under the law to change electrical provider, electrical service. Then they're limited to whatever's under the law. What happens? What happens is what exactly happened. What's already happened. Pardon me? What happens is what's already happened. They exercised their powers as an investor owned utility customer to take competitive power supply. All right. And they have done that. See, they've made choices in this case. They act like they've been constrained. In 1995, they had no obligation to become an investor owned utility customer. They made that election for their own business reasons, I'm sure. When they signed this contract in 1997, they are charged with knowledge of the tariffs. They are charged with knowledge of the customer choice act. Yes, the trial court focused on a narrow issue. I think it was 1,000%, right? You don't read that clause. And, Your Honor, I just want to read it. Because when you cherry pick it and you read the part that says, thereafter, the customer may take electric service from any source, if you stop there, it sounds like an incredibly broad carte blanche ongoing option. But the word or puts a second clause into the same sentence and it provides context. So there are two choices that are going to occur. Thereafter, customer may take electric service from any source or may take electric service under any of AMRU's generally available service classifications. Why wouldn't thereafter apply to either of those phrases? It does. Thereafter they can make a choice or thereafter they can. It does. But their time to choose was constrained. They knew three years was going to be up. Something had to happen at midnight on December 31st. On that exact moment. They had to make a decision right then. Got one second. And they did. They chose to take it. They continued to take the service. Not only did they continue to take the service, but their bill said your discounts are gone. Every month when their bill came in, the first bill came within two weeks of that. It says your discounts are gone. Their bill went up. And they still elected to stay. Could they have terminated it before that moment? I'm sorry? Could they have terminated their contract before that moment? There are termination provisions in the contract, but I can't recite them to you as a standard. There was termination language. I wish I could quote it to you right now, but it does have language. But let me say this. There's nothing in there that the contract incorporates by reference. Explicitly mirrors all of the rates, terms, and conditions of Amherst tariffs. So, really, this contract, the only thing that's different between this contract and the tariff is the rate of discounts. And there's their effort goals. But other than that, it mirrors the tariff language. And the reason for that is the commission doesn't want Amherst handing out discounts. Other people would like discounts. All employers would like to say, I may move out of here. I want a discount. The commission said you can do it three times in your territory. It's five years only, and it's got a null and void sunset date. So there is no contract after midnight. That's just the way it is. Insurance policies lapse on a date certain. People have to make decisions. That's why these have terms. That's what a sunset date is. There's nothing hidden, concealed, or hard to understand about this. And it is a sophisticated business. And we see they know how to negotiate between two providers. And they know how to read the law. And they know how to get the best advantage that's available to them. Amherst hasn't constrained anyone's choices. The General Assembly, when it fundamentally rewrote public utility regulation in the state in 1987, and the General Assembly couldn't have said it more clearly. The language is undeniably expressed. There are several decisions, appellate court decisions, at Amherst that are cited in our brief. You cannot switch delivery service providers after the enactment of this statute. We are preserving them. And they've already switched supply. They have purchased competitive power supply. Okay, but then what difference does it make how we interpret this contract? Well, it really doesn't because they have no right to switch delivery service providers. They want you to give them rights under the contract that would contradict the statute. Well, that's what I'm trying to get at. I mean, your claim is that Highland Supply is trying to get something more because of the contract than the law would otherwise allow them to get. They're trying to get something no other similarly situated industrial utility customer would be able to get. Okay, so I get back to my point. If I say, okay, you're right on the contract. Thereafter, you have a choice. Whatever choice is allowed to you by law, just like every other consumer. They don't have anything more than they've already got? Well, Your Honor, you know, and I believe Mr. Dukko indicated no one knew in 1997 what would eventually happen. They didn't know if a competitive market would actually occur. And, in fact, this would have been a little slower than people thought. And it's taken a while to get down to the residential. So there was option issues. Commission still had forms to work out, which really weren't really worked out I think until 2000, 2001. Then there were different options. But what happened was they gambled. They wanted to have a discount. And a discount carry comes with the stick of being a public utility customer governed by the Public Utilities Act and the Commission Tariffs. That's what's constraining them. But your interpretation of the contract is that unless they exercise a one-time option, now they must obtain their electrical supply from Ameren forever. No. Or delivery. Delivery, yes. Delivery, yes. That's what we call the wires. Forever. The wires and the power plants generated in the wires delivery. We're a wires business. We're regulated. Power plants are disconnected.  REs, Alternative Retail Electric Suppliers have to register with the Commission. Anybody with a computer and a desk can become an REs and start brokering electricity on the grid. It is a new world. It's a very new world for public utility customers. Plaintiff cites a statute that says electric service means both supply and delivery. Do you dispute that? I'm sorry, I didn't quite hear that. The plaintiff claims that the statute, and I don't know what the statute is, says that electric service means both supply and delivery. You're contending it doesn't. That's the wrong context. It does actually say that. But what it does say unequivocally, and I don't think there's any questioning by pilot supply, you cannot uncouple from delivery service if you elect to buy competitive power supply. Once you became an investor in the utility industry, you cannot get out of that because of the investment. So you get to provide delivery service forever? Yes, sir. As long as we're complying with Commission regs and tariffs and meeting our obligation to the rate payers, that's what a regulated utility is. That's what the tariffs are for. And your argument about that has nothing to do with the contract, right? Your Honor, we have a lot of points below. We touched on a lot of issues. I'm happy this Court can look at the record and affirm on any reason or basis you want to. We believe the trial court got it right because of the word or. Because of the word what? Because of the disjunctive or in the sentence. You can't read the thereafter clause in isolation. And that's Contracts 101. You've got to look at the context. You've got to look at the whole agreement. And the agreement says, thereafter, you're going to take electric service from any source or you're going to become Ameren's tariff customer. They knowingly, voluntarily elected and chose to become Ameren's tariff customer. No one put a gun to their head. And once they did that, they become subject to a regulatory scheme. And all we're saying is the General Assembly does not want to undermine the delivery service monopoly. When they created the power supply option, they did it to help consumers, to help keep jobs and businesses in the state, to hopefully develop a competitive power supply pricing. That was a major change in the traditional 100-year-old utility regulation model that had vertically integrated power plants and wires business. So having supply knows how to pick and choose. The difficulty is they want to keep picking and choosing forever. There's no barrier to their argument. They could flip every month if you read this as broadly as they want to. They could go back and forth every month and continue to hold each supplier hostage and jeopardize the investment in infrastructure, in poles, in wires, in conductors, in transformers. The General Assembly did not want that to happen. That's destructive competition. That's not healthy competition. Healthy competition is in the power supply. That's where you can shop. That's where you can get discounts. They just want to keep shopping. And no other customer has that. So, again, you know, Judge Harrison really got it right. If you want to just look at the dictionary and look at that phrase, or says you've got a choice. And we cite three or four cases in our briefs where Illinois courts have said when they see a phrase like that, or, and there's two choices, that means the choice is now. It doesn't mean you get to pick one and then later go back to the other. And that's what Highland Supply wants. They'd like you to read that first sentence without looking at context, without looking at or. They became a tariff customer voluntarily, willingly, by choice, with full knowledge of the consequences. And they took that service for eight years. They lost the discounts. Now, you know, you tell me what business is looking at that bill and seeing it go up, because they did not make a stipulation. You can infer that they were happy to become an investor on utility investment at midnight on December 31, 2000. They own two manufacturing plants. As Mr. Lukos said, they do business all over the world. They're watching the meter. They're watching their pocketbook. They made a business decision that it was in their interest to stay as a hammer and tariff customer. And I really want to make clear, tariffs, you know, the contract is a very narrow carve-out by the grace of the Congress Commission. And when he talks about parties to this agreement, you know, in a very real sense, not in a legal sense, but in a very real sense, the Congress Commission is the custodian of public interest in these scenarios. And the public interest is infused in this contract. This is not a garden variety, arm's length contract. This is a heavily regulated industry where the authority and power to even have this contract originates from the commission. Why did the commission grant it? To help Illinois Power keep customers that could leave. And this customer doesn't like the stick, but they sure munched down on the carrot. And we don't want to give them any more carrots. And the General Assembly doesn't want to give them any more carrots. Because the General Assembly views that as undermining deregulation. Municipal electric utilities, like the city of Highland, are not subject to anybody's rates, terms, and conditions regulation. They're creatures of the Illinois Municipal Code. And the same thing goes for rural electric cooperatives. We have three business models in the state by which electricity is delivered. Yes, sir. I was still listening, but I was thinking of a question. And I guess my question is this. It would get back to the same thing I'm struggling with here is in the absence of this contract, where would Highland Supply be? And so had you never had this contract with Highland Supply, what would stop them now from going to the municipal provider? The contract doesn't matter at all. It's been going away since 2000. I understand. Okay, if you never had it, they became an industrial utility customer in 1995. We didn't need a contract. We had tariffs. They voluntarily subjected themselves to that scheme of regulation. And they could not switch to city of Highland? Well, after 1997, they could not. They could not switch to delivery service providers. I'm not prepared to answer what they could do prior to 1997. But the General Assembly said, if you are a plug utility customer, industrial utility customer, on the effective date of this act, you now have this choice. Hopefully, they meant it would come to fruition by competitive power supply. You do not have a choice to uncouple from your delivery service provider. That's the way the General Assembly wanted it for very important reasons. It was as of that date. It was as of the effective date of that act, right? And you can probably infer that they had a three-year date on this contract, too, because everyone knew it would take some time before this competitive market really wasn't going to come into place immediately on December 17, 2000. And it was a very complex process. So that gave pilots five, three years to see what developed. And whatever developed caused them to choose to remain Amarant's customer as a tariff customer. The contract, I don't know how much clearer it can get. It says this contract is null and void on the sunset date. How can a contract have any continuing validity after that? You know, if you're doing a real estate transaction and you want covenants to continue to run, you better say it. You want covenants to run with the land after the closing of the transaction, you better say it. Otherwise, they're merged into the deed. Where do they get this ongoing, continuing power under a contract that they agreed would be null and void? Does null and void not mean null and void? They didn't expressly reserve any power, you know, to have an ongoing choice. But frankly, if they did, it would contravene the General Assembly's policy. The General Assembly did not, you know, they're taking away something. There's a give and take here, but utilities are saying we want deregulation of the supply side of the business. We want to preserve the delivery side of the business as is, and that is the regulated utility. You know, that vertically integrated business model is no more. And those power plants have been sold off to third-party marketers and alternative retail energy services. So that is a brave new world, but the General Assembly definitely meant to preserve that. And I really hope I've addressed your struggle. Our view is the circuit court heard a lot. There's a lot burning around this case. There are a lot of ways to go with it. Each side, there's no real undisputed facts. We've both submitted summary judgment motions. The circuit court really, I think, in a very reasonable manner said, or means you've got to come to a point, you've come to a fork in the road where you need to make an election. Thank you very much. Thank you, Mr. Templin. Thank you, Mr. Templin. Mr. Leuco, rebuttal. And let me get back to my question here, which is, is Highland Supply, because of the contract, trying to get something they wouldn't otherwise be allowed to do? There's no way you can avoid whatever the regulations are, is that right? But I am going to suggest, a little fast with the notion, we do have competition. We can enter into an agreement with the municipal electric utility. One's available, opportunity for in the city of Highland. We could do that. They would have you say, oh, wait a minute, despite the municipal code controlling that, we get to trump that as to delivery. You are stuck with us. This may be a battle for another day. And I'm going to say, but they would say no under the judge's current interpretation of our contract that limits us to a single opportunity. That's what we have to overcome. It's that interpretation that is so wrong. And the tariff, that he's alluding to in the Public Utility Act, both permit the kind of contracts they allow us to contract around the terms and provisions of the Public Utility Act and the terms and provisions of the tariffs themselves. He makes fast when he says, we became a tariff customer. Well, if he would say that at midnight and the pumpkin came out and we made our choice, here's what the phrase says. Thereafter, a customer may take electric service from any source or may take electric service under any of the utilities generally available service classifications for which a customer qualifies by virtue of its load usage characteristics. It doesn't say we're becoming a tariff customer. It tells us what our rates are going to be if we choose them. It doesn't tell us what our rates are going to be on our other choices. It doesn't mean that we are locked in forever as a tariff customer or we're bound to delivery. It doesn't say that. And I mind you, Judge Harrison never even dealt with the or issue. In his order, he simply says, he cuts it short. He says, I'm going to deal with the phrase, thereafter, a customer may take electric service from any source. Both. Didn't say delivery service, though. It says electrical service. He says electric service. I'm sorry. Yes. He doesn't even deal with the or issue, but the or issue is a red herring also. How do you respond to the defense argument that you want to be, under your theory, you could flip every month and that was not the intent of the legislature for delivery service? Well, we could, but think about that. We're in an economic real world. So you think you could flip every month? I think as the court said, we did not. I think we have an ongoing and unlimited option to choose. In the real world, who is going to negotiate contracts with us that are daily contracts, monthly contracts? I mean, that isn't going to happen. But why should we lose that vis-a-vis Illinois power in Amherst? Let me make sure I understand, too. I mean, all you're asking us to do is reverse the trial court's interpretation of the contract. And then you would be subject to whatever legislation and regulations there are that govern your choices. We're always subject to the law. But we're also subject to this contract as it sets forth the rights of us and Illinois power, our amity. And that we believe we have an unfettered right there. They cannot do anything to impede us. And the court has given an interpretation of construction that allows them to do that, allows them to make this argument that because of the contract, we're stuck with that. I can't help it because I'm listening to this, and we cited some things in the brief, and we're all of an age. I wish I could sing. Because if I could sing, I would sing you a classic verse of a classic song that is where we are. We're not in the Hotel California, but they want to have us in the Hotel Amherst. If you remember, it goes something like this. The last thing I remember, I was running for the door. I had to find the passage back to where I'd been before. Relax, said the night man. We are programmed to receive. You can check out any time you like, but you may never leave. That's what they want to say to us. Nice try, guys. Competition's a good thing. That's how we got you, but not so fast. I think that's absurd. I think it is not within the statutory scheme. I don't think it's what the contract means at all. Thank you. Thank you both for your really excellent briefs and really excellent arguments. It's an interesting case. Take this matter under advisement and issue our decision in due course. With that, we're going to take a brief recess.